UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

REED INTERNATIONAL, INC.,

                              Plaintiff,

          – against –

AFGHANISTAN INTERNATIONAL
BANK,

                              Defendant.

**OPINION & ORDER**

21-cv-10626 (ER)

RAMOS, D.J.:

Reed International, Inc., is a company headquartered in Virginia that provided security, training, and logistics services in support of the United States Military in Afghanistan.  Doc. 1 ¶¶ 1, 8.  It brings this breach of contract action against Afghanistan International Bank ("AIB").  In order to obtain a private security company license from the Ministry of Interior Affairs of Afghanistan ("the Ministry"), the Ministry required Reed to obtain a bank guarantee from a licensed bank in Afghanistan.  Reed secured a guarantee from AIB, which is based in and operates in Afghanistan.  Reed also maintained a bank account with AIB.  Upon the expiration of the guarantee, Reed requested the return of its funds in the guarantee as well as in its bank account.  AIB refused to do so.  Reed alleges that AIB's refusal to release the funds is a breach of the guarantee and account agreements.  Both the guarantee and account agreement contain forum selection clauses designating Afghanistan as the proper forum for any disputes arising out of those contracts, however, Reed filed the instant complaint in this District.

Pending before the Court are two motions:  (1) AIB's motion to dismiss the complaint for *forum non conveniens*, improper venue, and lack of personal jurisdiction; and (2) Reed's motion for limited jurisdictional discovery.  For the reasons discussed below, AIB's motion to dismiss is GRANTED, and Reed's motion for limited jurisdictional discovery is DENIED.

## I.  BACKGROUND

### A.  Factual background

The Ministry required Reed to obtain a bank guarantee from a bank registered and licensed by Afghanistan's central bank, Da Afghanistan Bank ("DAB") in order to obtain a private security company license.  Doc. 1 ¶ 1, 18.  On August 22, 2018, Reed obtained the guarantee from AIB in exchange for cash collateral in the amount of $300,000.  *Id.* ¶ 1.  AIB is the largest private bank in Afghanistan and is charted under, and operates subject to, the commercial banking laws of Afghanistan.  *Id.* ¶ 9.  By its terms the guarantee was initially set to expire on August 23, 2019.  *Id.* ¶ 19.  The guarantee was extended twice and remained valid and in effect through August 21, 2021.  *Id.*

AIB submits that in addition to signing the guarantee, Reed also issued a counter-guarantee for and on behalf of itself to AIB on September 24, 2018 from its office in Kabul, the capital of Afghanistan.  *See* Doc. 22 ¶ 11; Doc. 22-5.  Reed does not mention the counter-guarantee in its briefing.  Lastly, Reed maintained an ordinary bank account with AIB under an account agreement.  Doc. 1 ¶ 3; Doc. 22-1.  Reed alleges that the account had a balance of $16,062.84 as of August 31, 2021.  Doc. 1 ¶ 3.

The Court notes that, in mid-April 2021, United States President Joseph Biden declared that American troops would leave Afghanistan by September 11 of that year. [1] On August 15, 2021, over two weeks before the official planned U.S. withdrawal date,

---

[1] Neither party discusses this background; David Zucchino, *The U.S. War in Afghanistan: How It Started, and How It Ended*, N.Y. Times (Oct. 7, 2021), https://www.nytimes.com/article/afghanistan-war-us.html

Taliban fighters entered Kabul.[2]  United States troops had withdrawn completely by August 31, 2021.[3]

In 2021 Reed decided not to renew its license with the Ministry beyond August 21, 2021, and shut down its operations in Afghanistan that month.  Doc. 1 ¶ 23. Accordingly, on September 1, 2021, Reed demanded that AIB return its funds held on deposit via letter.[4]  *Id.* ¶ 6.  The funds were not released to Reed.  *Id.*  By letter dated September 23, 2021, Reed again requested the return of the funds securing the guarantee. Doc. 1-4.  In response, AIB replied via letter outlining the appropriate procedure Reed needed to follow for the release the funds.  Doc 1-5.  Specifically, Reed was instructed to submit a "No Claim Letter" from the Ministry and the "Original Guarantee" with all its subsequent amendments.  *Id.*  Reed did not follow these procedures.  According to Reed, "AIB knows that it is unlikely that Reed . . . will travel to Afghanistan and get the originals of the [g]uarantees and a [no claim] letter back from the [Ministry]."  Doc. 1 ¶ 31.

Reed also requested that AIB transfer the $16,062.84 from its bank account.  In response, AIB informed Reed that all international transactions were currently on hold based on instruction of DAB circular no. 7618/6733.  Doc. 1-5 ¶ 1.  Reed claims its demand was unlawfully denied.  Doc. 1 ¶ 6.

---

[2] Center for Preventative Action, *Instability in Afghanistan*, GLOBAL CONFLICT TRACKER (Oct. 19, 2022), https://www.cfr.org/global-conflict-tracker/conflict/war-afghanistan

[3] *Id.*

[4] The letter itself was not included in the record, but it was referenced in a subsequent letter dated September 23, 2021 from Reed to AIB ("Reed has requested the return of the cash collateral via letter dated September 1, 2021.  However, AIB has not yet released the funds to Reed.").  Doc 1-4 ¶ 2.

*Forum selection provisions*

The guarantee states that it is subject to the Uniform Rules for Demand Guarantees, ICC Publication No. 758 ("URDG 758"),[5] which contain a mandatory forum selection clause that requires any dispute concerning the guarantee to be heard in Afghanistan.  *See* Doc. 1-2 at 1.  "Unless otherwise provided in the guarantee, any dispute between the guarantor and the beneficiary relating to the guarantee shall be settled exclusively by the competent court of the country of the location of the guarantor's branch or office that issued the guarantee."  URDG 758 Art. 35(a).  In the guarantee, AIB is the guarantor and the Ministry is the beneficiary.

Critically, however, the counter-guarantee Reed issued to AIB is also subject to the URDG, and therefore subject to the URDG's forum selection clause.  "Where, at the request of the counter-guarantor, a demand guarantee is issued subject to the URDG, the counter-guarantee shall also be subject to the URDG, unless the counter-guarantee excludes the URDG."  *See* URDG 758, Art. 1(b).  URDG 758 provides that any dispute between Reed (as counter-guarantor) and AIB (as the guarantor) "shall be settled exclusively by the competent court of the country of the location of the counter-guarantor's branch or office that issued the counter-guarantee."  URDG 758, Art. 35(b).  Because Reed issued the counter-guarantee from its Kabul office, Afghanistan is the

---

[5] The Uniform Rules for Demand Guarantees were developed by the International Chamber of Commerce (ICC), a global business organization based in Paris.  The URDG do not have the force of law, but must be incorporated by express reference in a demand guarantee or counter-guarantee to apply.  The URDG are endorsed by the UN Commission on International Trade Law and have gained international acceptance and official recognition by bankers, traders, industry associations and international organizations.  Uniform Rules for Demand Guarantees (URDG), Practical Law Glossary Item w-018-1018; *see also* INT'L CHAMBER OF COM., ICC UNIFORM RULES FOR DEMAND GUARANTEES (2010 Ed. 2010) (ebook).

designated venue.  Doc. 22-5.  The Parties do not dispute that they agreed to the terms of the guarantee and the account agreements.

Likewise, the account agreement provided that Reed agreed to be bound by Afghan law and required the parties to submit to jurisdiction in Afghanistan should any disputes arise ("Any complaint or claim against [] [AIB] must be lodged in Afghanistan and with the Office of CEO of the Bank or as prescribed by the [DAB].").  Doc. 22-1 ¶ 30(b).

### B.  Procedural background

Reed filed the instant complaint on December 13, 2021, alleging breach of contract, and in the alternative, unjust enrichment.  It sought to recover a total of $316,062.84.  Doc. 1 ¶ 49.  On April 26, 2022, AIB filed a motion to dismiss, arguing that the forum selection clauses in the guarantee and the account agreements require this Court to dismiss the complaint on the basis of *forum non conveniens*.  Alternatively, AIB argues venue is improper in this district, and that AIB is not subject to personal jurisdiction in this Court.  Doc. 23 at 6–7.  Concurrently, on May 9, 2022, Reed filed a motion for jurisdictional discovery.  Doc. 24.

## II.    LEGAL STANDARDS
### A.  Personal jurisdiction

In diversity or federal question cases, personal jurisdiction is determined in accordance with the law of the forum in which the federal court sits.  *Whitaker v. Am. Telecasting, Inc*., 261 F.3d 196, 208 (2d Cir. 2001) (citing *Bensusan Rest. Corp. v. King*, 126 F.3d 25, 27 (2d Cir. 1997)).  This determination involves a two-step analysis.  *Metro. Life Ins. Co. v. Robertson-Ceco Corp*., 84 F.3d 560, 567 (2d Cir. 1996).  In New York,

courts must first determine whether personal jurisdiction is appropriate pursuant to the State's general jurisdiction statute, Civil Practice Law and Rules ("C.P.L.R.") § 301, or its specific jurisdiction statute, C.P.L.R. § 302.  General jurisdiction over foreign corporations is proper when the corporation's affiliations are so continuous and systematic that they are essentially "at home" in the forum state.  *Daimler AG v. Bauman*, 134 S. Ct. 746, 754 (2014).  "Specific jurisdiction is a significantly more limited doctrine" than general jurisdiction.  *Dennis v. JPMorgan Chase & Co.*, 343 F. Supp. 3d 122, 202 (S.D.N.Y. 2018).  For a state court to exercise specific jurisdiction, the suit must arise out of the defendants' contacts which create a substantial connection with the forum state.  *Id.* at 202–03.  The due process inquiry requires courts to evaluate the "quality and nature of the defendant's contacts with the forum state under a totality of the circumstances test."  *Licci ex rel. Licci v. Lebanese Canadian Bank*, SAL, 732 F.3d 161, 170 (2d Cir. 2013) (quoting *Best Van Lines, Inc. v. Walker*, 490 F.3d 239, 246 (2d Cir. 2007)).

Additionally, courts in New York State may exercise specific personal jurisdiction over defendants under the New York long-arm statute if (1) the defendant transacts any business within the state, and (2) the cause of action arises from that business transaction.  *Alibaba Grp. Holding v. Alibabacoin Found.*, No. 18 Civ. 2897(JPO), 2018 WL 2022626, at *4–8 (S.D.N.Y. Apr. 30, 2018) (citations omitted); *see also* C.P.L.R. § 302(a)(1) (NY long-arm statute).  "A suit will be deemed to have arisen out of a party's activities in New York if there is an articulable nexus, or a substantial relationship, between the claim asserted and the actions that occurred in New York."

6

*Royalty Network Inc. v. Dishant.com, LLC*, 638 F. Supp. 2d 410, 422 (S.D.N.Y. 2009) (quoting *Best Van Lines*, 490 F.3d at 246).

### B.  Venue

"The legal standard for a motion to dismiss for improper venue is the same as a motion to dismiss for lack of personal jurisdiction." *Casville Invs., Ltd. v. Kates*, 12 Civ. 6968 (RA), 2013 WL 3465816, at *3 (S.D.N.Y. July 8, 2013) (citing *Gulf Ins. Co. v. Glasbrenner*, 417 F.3d 353, 355 (2d Cir. 2005)).  "When a defendant challenges either the jurisdiction or venue of the court, the plaintiff bears the burden of showing that both are proper."  *Id.*  (citing *DiStefano v. Carozzi N. Am., Inc.,* 286 F.3d 81, 84 (2d Cir. 2001); *Savoy Senior Hous. Corp. v. TRBC Ministries*, 401 B.R. 589, 596 (S.D.N.Y. 2009)).  To meet this burden, the plaintiff must plead facts sufficient for prima facie showing of jurisdiction or venue.  *Glasbrenner*, 417 F.3d at 355 (citing *CutCo Indus. v. Naughton*, 806 F.2d 361, 364–65 (2d Cir. 1986)).  Venue is proper in the chosen forum if:  (1) at least one defendant resides in the district and all the defendants reside in the same state in which the district is located, (2) a "substantial part" of the events giving rise to the claim occurred in the district, or (3) the defendant is subject to personal jurisdiction in the district and "there is no district in which an action may otherwise be brought."  28 U.S.C. § 1391(b).

### C.  Forum non conveniens

The appropriate procedural mechanism for filing a motion to enforce a forum selection clause designating a foreign forum is a motion to dismiss for *forum non conveniens*.  *Atlantic Marine Const. Co. v. U.S. Dist. Court for W. Dist. of Texas*, 571 U.S. 49, 60 (2013).  The *forum non conveniens* doctrine allows a court to dismiss an

action "even if the court is a permissible venue with proper jurisdiction over the claim." *LaSala v. Bank of Cyprus Pub. Co. Ltd.*, 510 F. Supp. 2d 246, 254 (S.D.N.Y. 2007) (*quoting Carey v. Bayerische Hypo-und Vereinsbank AG*, 370 F.3d 234, 237 (2d Cir. 2004)).  "A decision to grant or deny a motion to dismiss a cause of action under the doctrine of *forum non conveniens* lies wholly within the broad discretion of the district court."  *Scottish Air Int'l, Inc. v. British Caledonian Grp., PLC*, 81 F.3d 1224, 1232 (2d Cir. 1996).

Ordinarily, a three-step analysis guides the exercise of this discretion.  If there is a forum selection clause at issue, however, the calculus is altered because a valid forum selection clause is given "controlling weight in all but the most exceptional cases." *Atlantic*, 571 U.S. at 51; *see also M/S Bremen v. Zapata Off-Shore Co.*, 407 U.S. 1, 10 (1972) (forum selection clauses are "prima facie valid" and should be enforced unless demonstrated to be "unreasonable" under the circumstances).  In such instances, the Court must determine (1) whether the forum selection clause is valid, and (2) whether public interest factors nevertheless counsel against its enforcement.  *Midamines SPRL Ltd. v. KBC Bank NV*, 12 Civ. 8089 (RJS), 2014 WL 1116875 at *3 (S.D.N.Y. Mar. 18, 2014).

### D.  Jurisdictional discovery

Whether to allow jurisdictional discovery is "a decision as to which a district court enjoys substantial discretion."  *Keren Chasanim Corp. v. Vill. of Kiryas Joel*, No. 07 Civ. 262 (SCR), 2008 WL 11518871, at *5 (S.D.N.Y. Nov. 10, 2008); *see also Broidy Cap. Mgmt. LLC v. Benomar*, 944 F.3d 436, 446 (2d Cir. 2019) ("[T]he district court has considerable latitude in devising the procedures it will follow to ferret out the facts

pertinent to jurisdiction." (quoting *Foremost-McKesson, Inc. v. Islamic Republic of Iran*, 905 F.2d 438, 449 (D.C. Cir. 1990))).  Yet, "a court ... does not abuse its discretion in denying jurisdictional discovery 'if the party seeking discovery cannot articulate a reasonable basis for the court first to assume jurisdiction.'" *Beierwaltes v. L'Office Federale De La Culture De La Confederation Suisse*, 999 F.3d 808, 828 (2d Cir. 2021) (quoting *Arch Trading Corp. v. Republic of Ecuador*, 839 F.3d 193, 206–07 (2d Cir. 2016)).

While the bar for granting "jurisdictional discovery is "low," *Universal Trading & Inv. Co. v. Credit Suisse (Guernsey) Ltd.*, 560 F. App'x 52, 55 (2d Cir. 2014), and it is appropriately granted where a plaintiff's allegations make a "sufficient start" toward establishing personal jurisdiction, *Uebler v. Boss Media, AB*, 363 F. Supp. 2d 499, 506 (E.D.N.Y. 2005), "if the plaintiff has failed to establish a prima facie case for personal jurisdiction, jurisdictional discovery is generally not granted." *RSM Prod. Corp. v. Fridman*, 643 F. Supp. 2d 382, 402 (S.D.N.Y. 2009).

However, if a plaintiff has identified a genuine issue of jurisdictional fact, discovery is appropriate even in the absence of a prima facie showing as to jurisdiction. *Daventree Ltd. v. Republic of Azerbaijan*, 349 F. Supp. 2d 736, 761 (S.D.N.Y. 2004). Nevertheless, "a court is not obligated to subject a foreign corporation to discovery where the allegations of jurisdictional facts ... fail to state a basis for the exercise of jurisdiction or where a plaintiff's proposed discovery, if granted, would not uncover facts sufficient to sustain jurisdiction," *Daventree Ltd.*, 349 F. Supp. 2d at 761, and "discovery need not be granted to permit a fishing expedition for jurisdictional facts," *Greer v. Carlson*, No. 20

Civ. 5484, 2020 WL 6064167, at *5 (S.D.N.Y. Oct. 14, 2020) (citing *RSM Prod. Corp.*,
643 F. Supp. 2d at 402).

## III.   DISCUSSION

AIB moves to dismiss Reed's claims on the bases of lack of personal jurisdiction*,*
improper venue*,* and *forum non-conveniens*.  It primarily argues that Reed agreed to the
forum selection clauses in the guarantee and account agreements and therefore this matter
must be heard in Afghanistan.  In its motion for jurisdictional discovery, Reed argues that
personal jurisdiction is appropriate and requests this Court require AIB to submit to
jurisdictional discovery.  Accordingly, the question of personal jurisdiction guides the
Court's analysis here.

### A.  Reed fails to establish personal jurisdiction

In its complaint, Reed alleges that "personal jurisdiction exists pursuant to CPLR §
302(a)(1) as AIB regularly transacts business within the state of New York."  Doc. 1 ¶ 16.  In
its response to AIB's motion to dismiss it also asserts, for the first time, that "AIB's contacts
with New York and this District are sufficient for this Court to exercise general jurisdiction
over AIB."  Doc. 28 at 18.

In New York, personal jurisdiction may be established over a defendant by
general jurisdiction under C.P.L.R § 301, or specific jurisdiction under New York's long-
arm statute under C.P.L.R § 302(a)(1).  Section 301 confers general jurisdiction where a
company "has engaged in such a continuous and systematic course of doing business in
New York that a finding of its presence in New York is warranted."  *Sonera Holding B.V.
v. Cukurova Holding A.S.*, 750 F.3d 221, 224 (2d Cir. 2014) (internal quotations,
modifications and citation omitted).  "[T]he general jurisdiction inquiry 'is not whether a

foreign corporation's in-forum contacts can be said to be in some sense continuous and systematic,' but rather . . . 'whether that corporation's affiliations with the State are so continuous and systematic as to render it essentially at home in the forum.'" *Brown v. Lockheed Martin Corp.*, 814 F.3d 619, 627 (2d Cir. 2016) (quoting *Daimler* 571 U.S. 117, 119, 139 (2014)).

New York's long-arm statute permits the exercise of specific jurisdiction over a nondomiciliary if the defendant "transacts business within the state" and the "cause of action arise[s] from" that transaction. C.P.L.R § 302(a)(1); *see also Eades v. Kennedy, PC Law Offices*, 799 F.3d 161, 168 (2d Cir. 2015) (internal quotation marks and citations omitted). A defendant transacts business within the meaning of § 302(a)(1) when it purposefully "avails itself of the privilege of conducting activities [in New York], thus invoking the benefits and protections of its laws." *Fischbarg v. Doucet*, 9 N.Y.3d 375, 380 (2007) (quoting *McKee Elec. Co. v. Rauland–Borg Corp.*, 20 N.Y.2d 377, 382 (1967)).

Reed rests its arguments for jurisdiction primarily on the relationships between AIB and two New York banks— Standard Chartered Bank New York and the Bank of New York Mellon ("BNY Mellon"). Additionally, it cites AIB's internet activity, alleged marketing, and other banking services as sufficiently substantial to confer jurisdiction. Doc. 28 at 17–18. Neither these banking relationships nor AIB's other activities tangentially related to New York are sufficient to confer jurisdiction under §§ 301 or 302(a)(1).

### 1. AIB's banking relationships

First, Reed alleges that AIB has maintained a correspondent banking relationship, including New York bank accounts, financial assets, and a demand deposit account with Standard Chartered Bank, and as a result, insists that there have been continuous and systematic contacts via these activities sufficient to confer personal jurisdiction.  Doc. 28 at 6, 16–17.  Secondly, Reed argues that personal jurisdiction is appropriate because of AIB's relationship with the Bank of New York Mellon ("BNY Mellon").  Reed also alleges that AIB has a banking agreement and "assets" with Citibank.  Doc. 28 at 17.

#### a. Standard Chartered Bank and §301 jurisdiction

Reed submits that AIB has admitted to holding a New York bank account with Standard Chartered Bank in a number of federal filings in a D.C. District Court case. Doc. 28-3 ¶ 86; *See U.S. v. Sum of $70,990,605*, No. 14-5031, 2014 WL 4629117 (D.C. Cir. July 18, 2014); *see also* Doc. 28-4 ¶ 6.  Reed also provides an excerpt from AIB's 2020 Annual Report in support of its claims that AIB held "financial assets" in Standard Chartered Bank:

> 14.1 Receivable from DoJ – This represents receivables from the [DoJ] … [t]he DoJ seized an amount of AFN 565.701 million (equivalent to USD 10.1 million) from the Bank's account with Standard Chartered's branch in New York . . . . the United States sought to reach the customer's Afghan-based accounts by seizing funds from the Bank's correspondent account in the United States.

Doc. 28 at 17.  However, the excerpt provided by Reed divorces the admission from important temporal context, as these assets were returned in 2013.  *See id., see also* Doc. 31 at 12.  Moreover, while AIB does in fact admit to having had a correspondent banking relationship with Standard Chartered Bank, that relationship ended by October 2019.  *See*

Second Declaration of Carasso ("Second Carasso Decl."), Doc. 30 ¶ 5; *see also* Carasso

Opposition Declaration ("Carasso Opp. Decl."), Doc. 32 ¶ 10.

Taken altogether, Reed argues that AIB has significant and lengthy ties to New

York and this District and, accordingly, this Court has personal jurisdiction over AIB.

Doc. 28 at 4.  However, "mere contacts" with the forum, "no matter how systematic and

continuous are extraordinarily unlikely" to qualify for the exercise of general jurisdiction.

*Brown*, 814 F.3d at 629; see also *In re Roman Catholic Diocese of Albany, N.Y., Inc.*, 745

F.3d 30, 39–41 (2d Cir. 2014) (finding that conducting a weekly mass in the forum state,

even if to some degree continuous and systematic, is not "so 'continuous and systematic'

as to render [the Diocese] essentially at home in the forum State.").

Further, to confer jurisdiction under § 301, the defendant must be doing business

in the purported jurisdiction at the time the action is brought.  *Puerto Rico Mar. Shipping

Auth. v. Almogy*, 510 F. Supp. 873, 878 (S.D.N.Y. 1981); *see also In re Terrorist Attacks

on Sept. 11, 2001*, 718 F. Supp. 2d 456, 476–77 (S.D.N.Y. 2010), *aff'd on other

grounds*, 714 F.3d 109 (2d Cir. 2013) (declining to confer general jurisdiction over the

bank because its office was not in existence at the time plaintiffs brought their action).

This action was brought in December 2021 and all of the connections to Standard

Chartered Bank that Reed alleges took place prior to that time.  Indeed, Reed's own

Exhibit 1-D contains an email dated September 26, 2019 in which AIB informs its

customers that "[AIB] is closing its [U.S. dollar] account with Standard Chartered Bank,

New York and [U.S. dollar] inward payments to [AIB] will not be made through

[Standard Chartered Bank]."  *See* Doc. 36-5 at 2.  Thus, any account AIB may have held

with Standard Chartered Bank would not confer jurisdiction under § 301 for the instant claim, which arose in 2021.

### b. Standard Chartered Bank and §302(a)(1) jurisdiction

Nor can jurisdiction be conferred under § 302(a)(1) based on AIB's correspondent banking relationship with Standard Chartered Bank, as Reed argues.  Doc. 28 at 16.  However, "by itself, a correspondent bank relationship, without any other indicia or evidence to explain its essence, may not form the basis for long-arm jurisdiction under [§ 302(a)(1)]."  *Daou v. BLC Bank, S.A.L.*, 42 F.4th 120, 129 (2d Cir. 2022) (quoting *Amigo Foods Corp. v. Marine Midland Bank-New York,* 39 N.Y.2d 391, 396 (1976).  To confer long-arm jurisdiction, the correspondent banking account must have some relationship to the claims alleged from which the court can infer that the correspondent account played any role in the alleged injury.  *State of Qatar v. First Abu Dhabi Bank PJSC*, 2022 WL 2158364, at *3 (N.Y. Sup. Ct. June 13, 2022).  Although multiple transfers to a New York account may establish minimum contacts with the state, a plaintiff must still establish "at a minimum, a relatedness between the transaction[s] and the legal claim such that the latter is not completely unmoored from the former."  *Universal Trading*, 560 F. App'x at 55 (2d Cir. 2014) (quoting *Licci v. Lebanese Canadian Bank*, 20 N.Y.3d 327, 339 (2012)).

Reed does not allege any connection between this New York correspondent banking relationship and the instant breach of contract claim.  "A suit will be deemed to have arisen out of a party's activities in New York if there is an articulable nexus, or a substantial relationship, between the claim asserted and the actions that occurred in New York."  *Royalty Network Inc. v. Dishant.com, LLC*, 638 F. Supp. 2d 410, 422 (S.D.N.Y.

2009) (quoting *Best Van Lines,* 490 F.3d 239, 246 (2007)).  *See Al Rushaid v. Pictet &
Cie*, 28 N.Y.3d 316, 328 (2016) (concluding that the non-domiciliary's use of a
correspondent bank "was precisely part of the defendant's design" to launder profits and
that this was sufficient to constitute the transaction of business in New York under §
302(a)(1)); *see also Licci v. Lebanese Canadian Bank*, 20 N.Y.3d 327, 340 (2012)
(conferring jurisdiction under § 302(a)(1) where the non-domiciliary bank "deliberately
used a New York account again and again to support Shahid and shared terrorist
goals[]").

While Reed does offer evidence that AIB directed Reed to transfer funds through
Standard Chartered Bank in New York, it fails to connect those transfers to the claim at
issue.  Doc. 36 at 7–8.  Reed alleges that from August 2016 through September 2019, it
transferred approximately $400,000.00 per month, most of which was transferred through
Standard Chartered Bank in New York at the direction of AIB.  *See* Rankin Decl., Doc.
36-1 ¶¶ 7–8.  In an undated communication sent to Reed entitled "Payment Instructions
for Inward Remittances" AIB says "[f]or receiving inward remittances into your account
with [AIB], we advise you to forward the following payment instructions to your
business partners."  Reed's Exhibit C, Doc. 36-4.  In other words, AIB alerted its
customers that in order to receive payments into their AIB accounts, the companies with
which they worked with would have to use Standard Chartered Bank as the intermediate
bank.

Notwithstanding this alleged instruction, Reed has failed to plead any facts that
connect its injury with AIB's correspondent banking relationship with Standard
Chartered Bank; Reed has not alleged any actions that occurred in New York.  To the

contrary, the alleged breaches arose from contracts agreed to in Afghanistan, under

Afghan law, and which relate to services provided in Afghanistan.  Doc. 1 ¶¶ 18, 33, 36.

### c.  Bank of New York Mellon and § 302(a)(1) jurisdiction

Secondly, Reed argues that personal jurisdiction is appropriate because of AIB's

relationship with the Bank of New York Mellon ("BNY Mellon").  Doc. 28 at 6.

Specifically, Reed argues that AIB has a correspondent banking relationship with Crown

Agents Bank ("Crown Bank"), a bank located in the United Kingdom, Doc. 1 ¶ 14, and

that Crown Bank, in turn, transfers U.S. dollars through BNY Mellon.  As a result, Reed

argues that AIB has sufficient contacts with New York to confer personal jurisdiction.

Doc. 1 ¶ 16; *see also* Doc. 28 at 16.  This conclusion is untenable.  In order to confer

jurisdiction to a foreign bank under a correspondent banking analysis, the foreign bank

must have a correspondent banking relationship *directly with* a U.S. bank.  *See Spetner v.*

*Palestine Inv. Bank*, 495 F. Supp. 3d 96, 111 (E.D.N.Y. 2020) (rejecting plaintiffs'

argument that defendant bank exercised sufficient control to confer jurisdiction when it

chose to work with a correspondent bank that used its own correspondent bank in New

York to make dollar-denominated transactions).

Indeed, in the two cases cited by Reed to support its position, the foreign bank

had a correspondent banking relationship with a bank *in* New York.  *See Gucci Am., Inc.*

*v. Weixing Li,* 135 F. Supp. 3d 87 (S.D.N.Y. 2015) (concluding that this District has

specific personal jurisdiction under § 302(a)(1) over the Bank of China, which opened a

correspondent account with JPMorgan Chase Bank in New York to facilitate transfers

directly from Chase customers to its customers); *see also Licci v. Lebanese Canadian*

*Bank*, 20 N.Y.3d 327 (2012) (affirmatively answering whether a foreign bank's

maintenance of a correspondent bank account at a financial institution in New York, and use of that account to effect 'dozens' of wire transfers on behalf of a foreign client, constitutes the transaction of business in New York within the meaning of § 302(a)(1)). AIB does not have a correspondent banking relationship directly with BNY Mellon, rather it has a correspondent banking relationship with Crown Bank, a UK based bank.

There is no transitive property in correspondent banking– that is to say, one correspondent banking relationship does not translate into a correspondent relationship with a third bank. *Spetner* is instructive on this point. In that case, American victims of terrorist attacks in Israel, their families, and their estates brought action in the Eastern District of New York against Palestine Investment Bank ("PIB"), alleging that it violated several provisions of the Anti-Terrorism Act by facilitating the transfer of U.S. dollars to fund terrorists. 495 F. Supp. 3d 96 (E.D.N.Y. 2020). PIB had neither a physical presence in New York nor any correspondent account, and on those bases, moved to dismiss for lack of personal jurisdiction. *Id.* 110, 117. Plaintiffs argued that because relationships existed that allowed for transfer of U.S. funds, there was New York jurisdiction. *Id.* at 111.

This case involved the transfer of money from the U.N.'s Oil-for-Food Program to the Arab Liberation Front's (ALF) leader in Palestine. *Id.* at 103. The funds could not go directly to the ALF's leader account at PIB because PIB lacked direct access to the New York banking system. *Id.* The complaint alleged that a part of the Oil-for-Food funds went into Iraq's state-owned Al-Rafidain Bank in Baghdad and that these funds were then transferred to Al-Rafidain Bank's branch in Amman. *Id.*

In order to receive U.S. dollars, PIB had to insert an intermediary between itself and Al-Rafidain's Amman branch.  *Id.* at 104.  PIB utilized its correspondent bank, the Arab Jordan Investment Bank ("AJIB") in Amman, as the intermediary.  *Id.*  AJIB could receive the U.S. dollar wires because it held correspondent accounts with at least two U.S. banks (Chase Manhattan Bank and the Bank of New York).  *Id.* at 104.  Thus, the Oil-for-Food funds allegedly went from the Al-Rafidain Bank's branch in Amman to PIB's correspondent account at AJIB, also in Amman.  Accordingly, the U.S. dollar transfer from Al-Rafidain Bank to PIB's correspondent account at AJIB would have needed to be cleared in New York.  *Id.*

Similar to the instant case, the plaintiffs in *Spetner* did not allege that PIB had direct contact with the New York banking system at any point during this chain, but instead argued that PIB had contact with AJIB in Amman through Al-Rafidain Bank's Amman branch.  *Id.* at 105.  Plaintiffs argue that AJIB acted as PIB's agent by maintaining a correspondent account for PIB in Amman, and that through this correspondent banking relationship, AJIB provided services that enabled PIB customers to send and receive U.S. dollar funds.  *Id.* at 111.  Plaintiffs did not allege, however, that PIB *chose* the providers of AJIB's two correspondent accounts in New York or exercised any say over which of the two accounts were used for specific transactions.  *Id.*  Instead, plaintiffs contend simply that PIB elected to work with AJIB because of its ability to clear and settle dollar-denominated transactions.  *Id.*

The *Spetner* court concluded that the PIB did not exercise "sufficient control" over the transactions as to constitute deliberate use and that the PIB did not purposefully avail itself by "directing" the flow of funds from its U.S.-based account holder into a

New York correspondent account maintained by AJIB.  *Id.*  Indeed, even if PIB knew

that transfers might occur in New York through the non-New York correspondent bank,

"knowing and expecting are not the same as direct and controlling."  *Id.* at 112.  This is

the same fatal flaw Reed's argument suffers from.


According to AIB's CEO, Joseph Carasso, AIB does not direct or control which

U.S. banks Crown Bank uses to process U.S. dollars.  *See* Carasso Support Declaration

("Carasso Decl."), Doc. 22 ¶ 23; *see also* Carasso Opp. Decl., ¶ 7.  And Reed does not

argue to the contrary, instead arguing in conclusory fashion that because "AIB's

correspondent bank relationship with Crown Bank requires all US Dollar transfers to be

processed through the Bank of New York Mellon, which is located in New York"

jurisdiction in this district is appropriate.  Doc. 28 at 6.  Indeed, Reed offers no evidence

of AIB directing Crown Bank what bank to use to transfer U.S. dollars.

Notably, Reed offers no evidence of direct activity between AIB and BNY Mellon

and instead asks this Court to grant a motion for limited jurisdictional discovery of AIB

to find such evidence.  Doc. 28 at 19; *see also* Doc. 25.  Even if there were a

correspondent relationship between AIB and BNY Mellon, Reed has not alleged

sufficient facts to establish that AIB's correspondent banking relationship proximately

caused any of the injury it alleges.  Accordingly, Reed cannot establish a personal

jurisdiction under § 302(a)(1) through AIB's relationship with Crown Bank.

### d.  Citibank and § 301 jurisdiction

AIB's purported relationship with Citibank also fails to confer jurisdiction under

§ 301.  Reed cites to (1) a press release announcing a banking agreement between

Citibank and AIB from over 12 years ago, (2) AIB's 2020 Annual Report that notes a "placement" (an investment) with Citibank, and (3) a 2019 email Reed claims contained an instruction from AIB to use Citibank as an intermediary.

As discussed above, to confer general jurisdiction under § 301, the defendant must be doing business in the purported jurisdiction at the time the action is brought. AIB maintains that it does not hold an account with Citibank anywhere in the U.S., including New York, s*ee* Carasso Opp. Decl. ¶ 11, and the 2010 press release and the 2020 Annual Report make no connection between AIB and Citibank in 2021, when the instant action was brought.

### e.   *Citibank and § 302(a)(1) jurisdiction*

To confer long-arm jurisdiction, the correspondent banking account must have some relationship to the claims alleged from which the court can infer that the correspondent account played any role in the alleged injury. *State of Qatar*, 2022 WL 2158364, at *4. Reed argues that AIB's contacts with New York are sufficiently tied to its claims because what it seeks is to recover the funds which it alleges were improperly denied, and these funds were transferred to AIB through banks in New York at some point. Doc. 36 at 8–9. However, the analysis Reed uses to confer long-arm jurisdiction only applies to a foreign bank's use of a correspondent bank in New York; not the use of a New York bank *by* the foreign bank's correspondent bank. Here, Reed does not and indeed cannot allege that AIB has a correspondent banking relationship with Citibank.

But even if Reed could show a correspondent banking relationship, its argument that "AIB instructed [Reed] to route funds through Citibank in New York" must fail. Doc. 36 at 8. In the email entitled "Informative Message" AIB *alerts* its U.S. customers

that Crown Agents Bank will be the new correspondent bank for U.S. dollar payments to AIB and that Citibank is the intermediary bank.  Doc. 36-5 at 2–3.  As the subject of the email implies, this is simply an informational message from AIB, not an instruction as Reed alleges.

In the same manner in which Reed cannot demonstrate that AIB *directed* Crown Bank to transfer money through BNY Mellon, it has not shown that AIB *directed* Crown Bank to process funds through Citibank.  *See Spetner,* 495 F. Supp. 3d at 111 (refusing to confer jurisdiction where a foreign bank did not exercise "sufficient control" over the transactions and did not purposefully avail itself by "directing" the flow of funds into a New York account).  Again, AIB's mere knowledge or expectation that Crown Bank could utilize the Citibank is "not the same as directing and controlling" Crown Bank to do so.  *Id.* at 112.

### 2.  *AIB's other contacts in New York*

Reed also cites AIB's internet activity, alleged marketing, and other banking services provided by AIB as factors that confer jurisdiction.  Doc. 28 at 17–18.  Notably, Reed does not cite any caselaw that demonstrates a precedent for jurisdiction under new York's long-arm statute for these activities.

Reed alleges that AIB is subject to personal jurisdiction because AIB's online banking allows its customers to transact business in New York and that "AIB markets its capability to customers, including New York residents."  Doc. 28 at 18.  AIB's internet activity is an insufficient basis for personal jurisdiction "[b]ecause websites are generally speaking, equally accessible everywhere, the mere availability of the site to users in New York, standing alone, does not amount to transacting business in the state for purposes of

§ 302(a)." *Royalty Network Inc. v. Dishant.com, LLC*, 638 F. Supp. 2d 410, 418 (S.D.N.Y. 2009) (internal citation omitted).  The alleged internet activity must be expressly targeted, or directed to New York, to establish the minimum contacts necessary to support the exercise of personal jurisdiction.  *Best Van Lines, Inc. v. Walker*, 490 F.3d 239, 251–55 (2d Cir. 2007).  Additionally, Reed must show that there is some nexus between the internet capabilities and the claims.  *See Mejia-Haffner v. Killington, Ltd*., 119 A.D.3d 912, 913 (2d Dep't 2014) (holding that an interactive website, accessible in New York, does not subject a party to jurisdiction, and that the "claim asserted [requires] some relationship to the business transacted via the website").  Because AIB is not targeting its internet activity to New York and there is no nexus between its website and the instant claim, AIB's internet activity does not confer jurisdiction under § 302(a)(1).

Next, Reed alleges, with no support, that "on information and belief, AIB provides significant banking services to the United Nations, which is also located in New York." Doc. 25 at 5.  However, the "Second Circuit has also held that participation in the United Nation's affairs by a 'foreign organization' may not properly be considered as a basis of jurisdiction in New York." *Sokolow v. Palestine Liberation Org*., No. 04 Civ. 397 (GBD), 2011 WL 1345086, at *5 (S.D.N.Y. March 30, 2011) (citing *Klinghoffer v. S.N.C. Achille Lauro Ed Altri-Gestione Motonave Achille Lauro in Amministrazione Straordinaria*, 937 F.2d 44, 51–52 (2d Cir. 1991)).

Lastly, Reed's arguments that AIB is engaging in directed marketing toward New York must also fail.  AIB notes in its 2017 Annual Report that it contributed to a number of community organizations that "support projects that have a beneficial impact on the communities where [AIB] operate[s]."  Doc. 28-5 at 8.  Reed contends that AIB's

involvement with "Women for Afghan Women," a New York-based grassroots organization, confers jurisdiction.  Doc. 28 at 8; *see also* Doc. 28-5 at 8.

Importantly, Reed does not allege that AIB advertised its services in New York but rather that it advertised its involvement with the organization.  First, the Court agrees with AIB that publishing its involvement with a charitable organization does not constitute a "marketing" effort.  Doc. 29 at 11.  And, more importantly, even if this were "marketing," it has no link to the claims in the instant case and thus would not confer jurisdiction under § 302(a)(1).

### B.  Venue is improper

Section 1391(b) states that venue is proper in the chosen forum if:  (1) at least one defendant resides in the district and all the defendants reside in the same state in which the district is located, (2) a "substantial part" of the events giving rise to the claim occurred in the district, or (3) the defendant is subject to personal jurisdiction in the district and "there is no district in which an action may otherwise be brought."  28 U.S.C. § 1391(b).  Reed's claims fail to meet all three of these requirements for venue in New York State.

Section 1391(b)(1), which provides that at least one defendant resides in the district, does not apply because the only defendant, AIB, is chartered under and operates subject to the commercial banking laws of Afghanistan.  Doc. 1 ¶ 9.

Section 1391(b)(2), which provides that a "substantial part" of the events giving rise to the claim must have occurred in the district, requires the Court to analyze Reed's claim in a two-part test.  First, the Court must identify the nature of the claims that allegedly give rise to Reed's claims.  *See Blakely v. Lew*, 13 Civ. 2140 (JMF), 2013 WL

6847102, at *3 (S.D.N.Y. Dec. 30, 2013) (quoting *Daniel v. Am. Bd. of Emergency Med.*, 428 F.3d 408, 432 (2d Cir. 2005)).  Second, the Court must "determine whether a substantial part of those acts or omissions occurred in the district where the suit was filed." *Id.*

Here, AIB's alleged breach of contract took place in Afghanistan.  Reed entered into the guarantee and account agreements knowing that AIB was based in Afghanistan and that the guarantee agreement was required in order to obtain a private security company license from the Ministry to conduct business in Afghanistan.  Doc. 1 ¶¶ 1, 3, 18.  No substantial part of the acts occurred in this district, indeed *none* did.

Finally, § 1391(b)(3) provides that the venue may lay in "any judicial district in which any defendant is subject to the court's personal jurisdiction with respect to such action."  Reed argues that AIB's contacts with New York and this District are sufficient for this Court to exercise general jurisdiction over AIB.  Doc. 28 at 18.  However, as discussed above, Reed fails to meet the standard to show general jurisdiction as well.

### C.  The *forum non conveniens* doctrine applies

In the Second Circuit, a forum selection clause is presumptively valid if it was reasonably communicated to the party resisting enforcement, is mandatory and not merely permissive, and covers the claims and parties involved in the suit.  *Phillips v. Audio Active Ltd.*, 494 F.3d 378, 383 (2d Cir. 2007).  To overcome this presumption of enforceability, plaintiffs have the burden to make "a sufficiently strong showing that 'enforcement would be unreasonable or unjust, or that the clause was invalid for such reasons as fraud or overreaching.'"  *Id.* at 383–84 (citing *Bremen*, 407 U.S. at 15).  Applying these standards to the guarantee and account agreements, and the Court finds

that the forum selection clauses are valid and that Reed failed to show a sufficiently strong reason why enforcement would be unreasonable or unjust.

### 1. *The clauses were reasonably communicated*

The first step requires the Court to ask whether the clauses were reasonably communicated to the party resisting enforcement, in this case, Reed.  Reed's pleadings acknowledge an awareness of the operative clauses and it relies on those documents in its complaint.  Additionally, Reed "is presumed to have read, understood and agreed to be bound by all terms, including the forum selection clauses, in the documents [it] signed." *Weingrad v. Telepathy, Inc.*, 05 Civ. 2024 (MBM), 2005 WL 2990645, at *4 (S.D.N.Y. Nov. 7, 2005) (internal quotation marks and citation omitted); *see also Horvath v. Banco Comercial Portugues, S.A.*, 10 Civ. 4697 (GBD), 2011 WL 666410, at *4 (S.D.N.Y. Feb. 15, 2011) ("it is a fundamental principle of contract law that a person who signs a contract is presumed to know its terms and consents to be bound"), *aff'd*, 461 F. App'x 61, 64 (2d Cir. 2012).  The guarantee is subject to the URDG 758, which contains a mandatory forum selection clause that requires this dispute to be heard in Afghanistan. *See* URDG 758 Art. 35(a).  The account agreement also has a forum selection clause. Doc. 22-1 ¶ 30(b).  Thus, the clauses were reasonably communicated in the guarantee and account agreements.  By issuing the counter-guarantee to AIB from its Kabul, Afghanistan branch, Reed agreed that Afghanistan is the exclusive venue to hear this dispute.  By consenting to URDG 758, Reed agreed the "governing law shall be that of the location of the counter-guarantor's branch or office that issued the counter-guarantee."  URDG 758, Art. 34(b).

2.   *The clauses are mandatory*

The second step requires the Court to classify the clauses as mandatory or permissive, that is, to decide whether the parties were required to bring any dispute to the designated forum or simply permitted to do so.  *Phillips* 494 F.3d at 383.

AIB argues that the guarantee and account agreement both include clear forum selection clauses, that mandate Afghanistan as the exclusive forum to resolve any disputes.  Doc. 23 at 11.  Reed, however, contends that the forum selection clause in the account agreement is a permissive clause, allowing Reed to pursue litigation outside of Afghanistan.  Doc. 28 at 12–13.  And, while Reed acknowledges that the guarantee is subject to URDG 758, it does not address the forum selection clause included in URDG 758.[6]  Doc. 1 at ¶ 30.  Additionally, Reed does not address the counter-guarantee at all.

A mandatory forum selection clause grants exclusive jurisdiction to a selected forum; on the other hand, a permissive forum selection clause only reflects the contracting parties' consent to resolve disputes in a certain forum, but does not *require* that disputes be resolved in that forum.  *Baosteel Am., Inc. v. M/V "OCEAN LORD"*, 257 F. Supp. 2d 687 (S.D.N.Y. 2003) (emphasis added).  "A forum selection clause is viewed as mandatory when it confers exclusive jurisdiction on the designated forum or incorporates obligatory venue language."  *Phillips,* 494 F.3d at 386.  "However, where only jurisdiction is specified, the clause will generally not be enforced without additional language indicating the intent of the parties to make jurisdiction *exclusive*."  *Central National–Gottesman, Inc. v. M.V. "GERTRUDE OLDENDORFF"*, 204 F. Supp. 2d 675,

---

[6] The account agreement does not include an URDG provision, but it does include an explicit forum selection clause.

678 (S.D.N.Y. 2002) (internal citation omitted) (emphasis added).  In other words, the
forum selection clause should make explicit that disputes are to be solved in that forum
and nowhere else, rather than simply stating that a certain forum shall have jurisdiction.
Yet, "[e]xclusive jurisdiction can be granted to a forum without the use of specific
language of exclusion (e.g., 'only', 'solely', or 'exclusively')."  *Macsteel Int'l USA Corp.
v. M/V Larch Arrow, her engines, boiler, etc.*, 354 F. App'x 537, 539 (2d Cir. 2009)
(quoting *Baosteel Am., Inc.* 257 F. Supp. 2d at 689).

     The Court finds that the counter-guarantee forum selection clause is mandatory.
In its complaint Reed concedes that URDG 758 is applicable under the guarantee.  Doc. 1
¶ 30.  URDG 758 provides that any dispute between Reed (as counter-guarantor) and
AIB (as the guarantor) "shall be settled *exclusively* by the competent court of the country
of the location of the counter-guarantor's branch or office that issued the counter-
guarantee."  URDG 758, Art. 35(b) (emphasis added).  By consenting to URDG 758,
Reed agreed the "governing law shall be that of the location of the counter-guarantor's
branch or office that issued the counter-guarantee."  URDG 758, Art. 34(b).  And by
issuing the counter-guarantee to AIB from its Kabul, Afghanistan branch, the parties
agreed that Afghanistan is the exclusive venue to hear this dispute.

     The Court also finds that the account agreement's forum selection clause is
mandatory.  AIB relies on clause 30(b) of the account agreement:  "Any complaint or
claim against the Bank *must be lodged in Afghanistan* and with the Office of CEO of the
Bank or as prescribed by the Da Afghanistan Bank."  Doc. 22-1 at ¶ 30(b) (emphasis
added).  This clause clearly confers venue.  Both the reference to a specific location and
the indication that the jurisdiction is exclusive, shows that this clause is mandatory.

*Phillips*, 494 F.3d at 386–387 (concluding that language in a recording contract providing that "any legal proceedings that may arise out of [the agreement] are to be brought in England" established England as the obligatory venue for any legal proceedings).

Courts are required "to focus on the 'mandatory force of the words,' that is, whether the language requires that an action be venued in a specifically designated forum." *Macsteel Int'l USA Corp.* 354 F. App'x at 540 (quoting *Phillips*, 494 F.3d at 386–87). Indeed, Reed does not address the guarantee's forum selection clause in its opposition papers at all. "Reed's failure to even address the URDG provisions is a concession that this mandatory forum clause applies and that this litigation can only be brought in Afghanistan." Doc. 29 at 6. Accordingly, the forum selection clauses in the guarantee and the account agreement are deemed to be mandatory.

### 3. *The claims and parties are subject to the forum selection clauses*

The third step requires the Court to decide whether the claims and parties involved in the suit are subject to the forum selection clause. In order to make that determination, the language in the agreements mandating that any claim arising out of the agreements must encompass Reed's suit. In other words, the Court must determine if Reed's claims *arise out* of the agreements. The Court holds that they do.

"[W]hen ascertaining the applicability of a contractual provision to particular claims, we examine the substance of those claims …." *Phillips*, 494 F.3d at 388. Reed's chief claim is breach of contract under the guarantee and the account agreement. Doc. 1 at 7–8. The substance of Reed's breach of contract claims is that AIB improperly refused to return the funds it held as collateral in the guarantee agreement and failed to permit the withdrawal from the account agreement. *Id.* ¶¶ 36, 43.

As noted above, the counter-guarantee is subject to URDG 758 which provides that any dispute between Reed (as counter-guarantor) and AIB (as the guarantor) "shall be settled *exclusively* by the competent court of the country of the location of the counter-guarantor's branch or office that issued the counter-guarantee."  URDG 758, Art. 35(b). (emphasis added).  And the account agreement states that "[a]ny complaint or *claim against the Bank* must be lodged in Afghanistan …."  Doc. 22-1 at ¶ 30(b) (emphasis added).  From the plain language of the two above clauses it is clear that these provisions apply to Reed's claims.  The action Reed brings is "[a] dispute between [AIB] and [Reed] relating to the guarantee" and a "claim against the bank" based on an alleged breach of the agreements.  Doc. 1 ¶¶ 33, 36, 39.  Both parties signed the guarantee, the counter-guarantee, and account agreements and are therefore subject to the clauses of the agreements.  *Id.* ¶¶ 33, 39.  Thus, the Court holds that the claims and the parties are subject to the language in the forum selection clauses.

### 4.  *Reed has failed to rebut the presumption of enforceability*

Having found that the forum selection clauses are presumptively valid, Reed has the burden to rebut this presumption.  To rebut a presumption that a forum selection clause is valid, a party must show that:  (1) the forum selection clause's incorporation was the result of fraud or overreaching, (2) the law to be applied in the selected forum is fundamentally unfair, (3) enforcement contravenes a strong public policy of the forum in which suit is brought, or (4) trial in the selected forum will be so difficult and inconvenient that the plaintiff effectively will be deprived of his day in court.  *National Union Fire Insurance Company of Pittsburgh, Pa. v. Wynn Las Vegas, LLC*, 509 F. Supp. 3d 38 (S.D.N.Y. 2020).  A forum selection clause is unreasonable if, among other

reasons, the selected forum is so "gravely difficult and inconvenient" that the complaining party will "for all practical purposes be deprived of its day in court" or enforcement of the clause would contravene a strong public policy of the forum in which the suit is brought, in this case New York.  *Bremen*, 407 U.S. at 18.

Reed opposes the enforcement of the forum selection clauses because doing so would deprive it of a trial on the merits and it would put its attorneys, employees, and executives at significant risk of personal harm.  Doc. 28 at 13.  Reed points to the fact that the Taliban and Haqqani Network control the Afghanistan government as the reason why it would be unreasonable for the action to be brought in Afghanistan.  Reed contends that the "hostile" Taliban and Haqqaini Network control the Afghani government, the local police force, and indeed the "entire country."  *Id.* at 4, 14–15; *see also* Doc. 36 at 11.  And that because of this, its representative would face significant risk including arrest, torture, and persecution if they were required to appear in Afghanistan for this matter and it would be deprived of a trial on the merits.  Doc. 28 at 14–15.  This is particularly true because it is a U.S. private security company.  *Id.* 14 n.7.  Further, Reed alleges that the Haqqani Network, a Taliban-related entity which is recognized as a terrorist group, controls the Ministry and the courts in Afghanistan.  *Id.* at 14–15.

AIB contends that given that the forum selection clauses at issue are mandatory, the Court need not evaluate whether Afghanistan is an adequate alternative forum, Doc. 23 at 19, and reminds the Court that "it is not the business of our courts to assume the responsibility for supervising the integrity of the judicial system of another sovereign nation."  *See Blanco v. Banco Indus. de Venezuela, S.A.*, 997 F.2d 974, 982 (2d Cir. 1993) (quoting *Chesley v. Union Carbide Corp.*, 927 F.2d 60, 66 (2d Cir. 1991)).

Further, AIB argues that Afghanistan has been a "complex" country for decades and that, nevertheless, Reed *chose* to conduct business there. *Id.* In support of its argument, AIB cites *Aracruz Trading* in which the court rejected a claim that violence in Nigeria rendered that country an inadequate forum because the plaintiff had chosen to do business in Nigeria before the incident that gave rise to its claim. *Aracruz Trading Ltd. v. Japaul Oil & Maritime Servs.*, *PLC,* 08 Civ. 3511 (JGK), 2009 WL 667298, at *5–6 (S.D.N.Y. Mar. 16, 2009).

As set forth above, the Court has found that the exercise of personal jurisdiction over AIB would be improper. Thus, dismissal is appropriate on that basis alone. However, even if Reed could overcome that hurdle, it does not provide sufficient information for this Court to hold that the forum selection clauses should not be enforced because Afghanistan would be so "difficult and inconvenient" that it "would be deprived of its day in court." *Breman,* 407 U.S. at 18. "[F]orum selection clauses should control except in unusual circumstances" and, despite Reed's arguments to the contrary, no such unusual circumstances exist in this case. *BMW of N. Am. LLC v. M/V Courage*, 254 F. Supp. 3d 591, 601 (S.D.N.Y. 2017).

Reed cites to two cases in support of its argument that it would be too difficult and inconvenient to enforce the forum selection clause. However, both cases are markedly distinguishable from the instant case. In *McDonnell Douglas Corp. v. Islamic Republic of Iran*, the court took judicial notice that "litigation of the dispute in the courts of Iran would, at the present time, be so gravely difficult and inconvenient that McDonnell Douglas would for all practicable purposes be deprived of its day in court" but only after citing "the recent escalation of the war between Iran and Iraq, the bombing

31

of Tehran by the Iraqi Air Force, Iraq's threat to shoot down all commercial planes over

Iran, and the suspension of flights to Iran, by several commercial airlines." *McDonnell*

*Douglas Corp. v. Islamic Republic of Iran*, 758 F.2d 341, 346 (8th Cir. 1985).  Reed has

provided no evidence of similar conditions.

   Correspondingly, in *Rasoulzadeh v. Associated Press*, where the court found that

"if the plaintiffs returned to Iran to prosecute this claim, they would probably be shot" the

plaintiffs were in a much different position than Reed.  *Rasoulzadeh v. Associated Press*,

574 F. Supp. 854, 861 (S.D.N.Y. 1983).  In this case, the plaintiffs were Iranian citizens,

residing in the United States, who had leased their houses to the Associated Press.  The

Associated Press breached the lease by permitting Canadian press to occupy the house,

which resulted in the house being seized by Iran due to the disfavor with which

Canadians were viewed after assisting American diplomats to escape from Iran.  The

distinction is clear between the plaintiffs in *Rasoulazadeh,* Iranian citizens in the process

of applying for political asylum in the United States, and Reed, a business that

"specialize[s] in operations located in remote, third world, multi-cultural and high-risk

geographical environments."[7]

   The very nature of Reed's services suggests that it will not be unusual for it to

operate in "difficult and inconvenient" locations.  Reed provided security, training, and

logistics services in support of the United States Military in Afghanistan.  Doc. 1 ¶¶ 1, 8.

It was well aware of the ongoing conflicts in Afghanistan and that it was agreeing to do

business subject to the laws of Afghanistan.  Accordingly, the Court finds that Reed has

---

[7] Reed, https://www.reedinc.com (last visited Feb. 20, 2023).

failed to rebut the presumption or enforceability, and thus the forum selection clauses will be enforced.

### D.  Jurisdictional discovery

Because Reed has failed to establish a prima facie case for personal jurisdiction and failed to establish a genuine issue of jurisdictional fact, its motion for jurisdictional discovery is denied.  *See RSM Prod. Corp.* 643 F. Supp. 2d at 402; *see also Daventree Ltd.,* 349 F. Supp. 2d at 765.  In exercising its discretion, a court must balance the need to avoid subjecting a foreign defendant to extensive jurisdictional discovery against a plaintiff's potential difficulty proving jurisdiction without discovery.  *Compare Jazini v. Nissan Motor Co., Ltd.*, 148 F.3d 181, 185–86 (2d Cir. 1998) (federal courts do not ordinarily conduct substantial jurisdictional discovery over foreign corporations), *with APWU v. Potter*, 343 F.3d 619, 627 (2d Cir. 2003) ("[The] court should take care to give the plaintiff ample opportunity to secure and present evidence relevant to the existence of jurisdiction.") (citation and internal quotation marks omitted).  Nevertheless, "[d]iscovery need not be granted to allow plaintiff to engage in an unfounded fishing expedition for jurisdictional facts." *Langenberg v. Sofair*, No. 03 Civ. 8339 (KMK), 2006 WL 2628348, at *6 (S.D.N.Y. September 11, 2006) (quoting *Gear, Inc. v. L.A. Gear Cal., Inc.,* 637 F. Supp. 1323, 1328 (S.D.N.Y. 1986)).

Accordingly, Reed's motion for jurisdictional discovery is denied.

**IV.   CONCLUSION**

For the reasons set forth above, AIB's motion to dismiss is GRANTED.  Reed's motion for jurisdictional discovery is DENIED.  The Clerk of Court is respectfully directed to terminate the motions, Docs. 21 and 24, and close the case.

It is SO ORDERED.

Dated:   February 21, 2023
         New York, New York

_____
                EDGARDO RAMOS, U.S.D.J.